```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ROBIN SMITH,                                    :
                    Plaintiff,                  :    OPINION AND ORDER
         -v.-                                   :
                                                     17 Civ. 2743 (GWG)
DEDRIC BROWN                                    :
                    Defendant.                  :
---------------------------------------------------------------X
```
**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Defendant Dedric Brown moves to substitute the United States of America (the "United States" or "Government") as defendant in this case and to dismiss the Amended Complaint filed by pro se plaintiff Robin Smith for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[1] For the reasons stated below, Brown's motion is granted and the case is dismissed.

I. FACTS

   A. Background

Both Smith and Brown were Immigration Service Officers ("ISOs") for the United States Citizenship and Immigration Services ("USCIS") Naturalization Unit in December 2014. See Compl ¶¶ 1, 3, 5; Declaration of Phillip A. Savage, dated June 21, 2017 (attached as Ex. 1 to Def. Mem.) ("Savage Decl."), ¶ 4. On Thursday, December 11, 2014, from 2:00 p.m. to 4:00 p.m., the USCIS Naturalization Unit held its holiday party in the Unit's waiting room. See

---

[1] See Amended Complaint, filed May 22, 2017 (Docket # 8) ("Compl."); Letter from Robin Smith to Judge Gabriel Gorenstein, dated May 22, 2017 (Docket # 9) ("Pl. Letter"); Notice of Motion, filed June 23, 2017 (Docket # 11); Memorandum of Law in Support of Motion to Substitute the United States as Defendant and to Dismiss the Case for Lack of Subject Matter Jurisdiction, filed June 23, 2017 (Docket # 12) ("Def. Mem."); Plaintiff's Corrected Response to Defendant's Motion to Substitute the United States as Defendant and to Dismiss the Case for Lack of Subject Matter Jurisdiction, filed July 18, 2017 (Docket # 20) ("Pl. Response"); Reply Memorandum of Law in Support of Motion to Substitute the United States as Defendant and to Dismiss the Case for Lack of Subject Matter Jurisdiction, filed July 31, 2017 (Docket # 21).

Compl. ¶ 3.  The party, held annually, serves to promote collegiality among USCIS employees and to boost employee morale.  See Savage Decl. ¶¶ 6, 8.  USCIS management selects the date of the party and solicits volunteers for a planning committee that then coordinates party logistics, including the provision of food and games.  See id. ¶ 9.  While the committee consists of both supervisory and non-supervisory employees, USCIS management is aware of and exercises authority over committee decision making.  See id. ¶¶ 9, 10.  Brown served on the planning committee, and Edna Baquie, a first-line supervisor and co-chair of the planning committee, asked Brown if he would volunteer to organize and run the games at the party, a regular feature of the Unit's holiday parties.  See Compl. ¶ 5; Declaration of Edna Baquie, dated June 22, 2017 (attached as Ex. 2 to Def. Mem.) ("Baquie Decl."), ¶ 3; Savage Decl. ¶¶ 10-11.  Brown agreed and suggested to the committee a game involving beaded necklaces, in which participants would be told not to use a particular word and would forfeit their necklaces if they did so.  See Compl. ¶ 7; Baquie Decl. ¶ 4.

B. Allegations in the Complaint

The following is a summary of the allegations in the complaint:

At the party, only members of the Naturalization Unit were present.  Compl. ¶ 4.  Brown was part of a group of ISOs who "are known for bringing alcohol to these parties."  Id. ¶ 6.  "This party was similar to other parties. [Brown's] eyes were glassy, but his breath didn't smell like alcohol."  Id.  At approximately 2:30 p.m., Brown suggested that the people at the party play a game in which "[p]articipants were required to wear Mardi Gras beads, and if someone said a certain word in conversation, one had to give his or her Mardi Gras beads to the other person in the conversation."  Id. ¶ 7.  Smith played the game with one of her coworkers, ISO Dawn Panetta.  Id. ¶ 8.  During Smith's conversation with Panetta, Brown approached Smith and aggressively

2

demanded that she give her beads to Panetta as part of the game. Id. ¶ 9. Because Brown was acting aggressively, Smith ignored him and walked away. Id.

Five minutes later, Brown approached Smith and again demanded that she give her beads to Panetta. Id. ¶ 11. After Smith "ran out of the Room to get away from" Brown, Brown said "[y]ou can run but you can't hide!" Id. ¶¶ 11-12.

Seven minutes later, Smith returned to the room and gave all but one of her beads to ISO Panetta. Id. ¶ 13. When Brown saw that Smith was still wearing a beaded necklace, he began to yell at her, demanding that she give Panetta all of her beads. Id. ¶ 14. Smith ignored Brown's demands and placed her hands around her single beaded necklace as she spoke to Panetta. Id. ¶ 15.

Brown put his hands over Smith's hands and demanded that she "let the beads go." Id. ¶ 16. Surprised by Brown's actions, Smith told Brown repeatedly to stop grabbing her hands. Id. ¶ 17. When Brown refused to remove his hands, Smith asked him: "What are you doing?" Id. Brown responded by demanding that she let go of the beads. Id. Smith told Brown to stop by saying "[y]ou are taking this too far" and "I am a woman." Id. ¶ 18. But Brown refused to remove his hands from Smith's neck. Id. After 7 minutes, Smith called for help. Id. ¶ 20. When another worker approached, Brown "pulled down on" Smith's hands, causing the beaded necklace around her neck to break and her arm to be scratched. Id. ¶ 22.

Immediately after the incident, Smith felt pain around her neck. Id. ¶ 23. She visited a nurse, complaining of severe neck pain and that she was having trouble holding her head upright. Id. ¶ 26. Smith later went to a hospital to have her neck and arm examined. Id. ¶ 27. She was given a soft cervical collar to wear for 3-4 weeks and was prescribed Robaxin, a pain killer. Id. ¶ 28.

C. Post-Incident Events

Smith was out of work for 45 hours, during which she received benefits under the Federal Employees Compensation Act, 5 U.S.C. § 8101 et seq., ("FECA"). See Compl. ¶ 30; Declaration of Julia A. Tritz, dated July 28, 2017 (Docket # 22) ("Tritz Decl."), ¶¶ 2, 7; Smith Official Timesheets (attached as Ex. B to Tritz Decl.). The Office of Workers' Compensation Programs ("OWCP") also reimbursed her for her medical expenses, totaling $485.94, from January 5, 2015 to April 30, 2015. See Tritz Decl. ¶ 6. These were short-term benefits, which did not require a formal adjudication of eligibility. See Tritz Decl. ¶ 5. After this suit was filed, OWCP issued a formal determination accepting Smith for FECA coverage. See id. ¶ 10; Office of Workers' Compensation Programs Acceptance Letter, dated July 12, 2017 (attached as Ex. D to Tritz Decl.) ("Acceptance Letter").

On March 8, 2017, two years and three months after the incident, Smith filed a summons and complaint in New York County Civil Court, naming Brown as the defendant. See Notice of Removal, filed Apr. 17, 2017 (Docket # 1) ("Removal Notice"); Summons with Endorsed Complaint, filed Apr. 17, 2017 (attached as Ex. A to the Removal Notice). The Government removed the action to this court on April 17, 2017, pursuant to 28 U.S.C. § 2679(d)(2), certifying that Brown was acting in the scope of his employment during the time of the incident. See Removal Notice; Certification of Joon H. Kim, Acting United States Attorney for the Southern District of New York, dated Apr. 13, 2017 (attached as Ex. B. to Removal Notice) ("Kim Cert.").

On May 22, 2017, Smith filed an amended complaint. See Compl. She moved by letter the same day to have this Court review the Government's certification that Brown was acting within the scope of his employment.

4

II.  DISCUSSION

The Government argues that the United States should be substituted for defendant Brown, because it has certified that Brown's actions fell within the scope of his employment. See Def. Mem. at 4-5.  The Government further argues that once this certification is accepted, the complaint must be dismissed for lack of subject matter jurisdiction.  Def. Mem. at 12.  Smith challenges the Government's certification, see Pl. Letter, and also opposes its motion to dismiss, see Pl. Response at 16.

We next review whether the United States should be substituted as a party.  We then consider whether the Court has subject matter jurisdiction over this action.

A.  Certification Under 28 U.S.C. § 2679

1.  Legal Standard for Certification Under the Federal Tort Claims Act ("FTCA")

28 U.S.C. § 2679(b)(1), part of the enactment commonly known as the "Westfall Act," provides:

> The remedy against the United States provided by [the FTCA] for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.  Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

28 U.S.C. § 2679(b)(d)(1) further provides:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

5

As the Supreme Court has explained, "[w]hen a federal employee is sued for wrongful or negligent conduct, the [Westfall] Act empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'" Osborn v. Haley, 549 U.S. 225, 229-30 (2007) (citing § 2679(d)(1)-(2)). Here, at the time it removed this case to federal court, the Government certified that Brown was acting within the scope of his employment with USCIS. See Kim Cert.[2]

If the certification remains in place, the United States is substituted as defendant and the federal employee obtains immunity from any personal liability. See 28 U.S.C. §§ 2679(b)(1), (d)(2) (2016); Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 2(b), 102 Stat. 4563, 4564 (1988) ("It is the purpose of this Act to protect Federal employees from personal liability for common law torts committed within the scope of their employment."); see also Hui v. Castaneda, 559 U.S. 799, 806 (2010) ("The Westfall Act amended the FTCA to make its remedy against the United States the exclusive remedy for most claims against Government employees arising out of their official conduct."); Regnante v. Sec. & Exch. Officials, 134 F. Supp. 3d 749, 768 (S.D.N.Y. 2012) ("The FTCA provides government employees acting within the scope of their employment with absolute immunity from suit.") (internal quotation marks omitted) (quoting McDowall v. Metro. Corr. Ctr., 2010 WL 649744, at *3 (S.D.N.Y. Feb. 22, 2010)).

However, "the Attorney General's certification is 'the first, but not the final word' on whether the federal officer is immune from suit and, correlatively, whether the United States is

---

[2] Through 28 C.F.R. § 15.4, the Attorney General has delegated certification authority to the United States Attorney for the district where the civil action is brought.

properly substituted as defendant." Osborn, 549 U.S. at 246 (quoting Gutierrez de Martinez v. Lamango, 515 U.S. 417, 432 (1995)). A tort plaintiff may seek de novo review of a § 2679(d) certification. McHugh v. Univ. of Vt., 966 F.2d 67, 72, 74 (2d Cir. 1992); accord Regnante, 134 F. Supp. 3d at 768 ("A plaintiff may challenge the Government's scope of employment determination under § 2679(d)(1) by alleging with 'particularity facts relevant to the scope of employment issue.'") (quoting Aryai v. Forfeiture Support Assocs., 25 F. Supp. 3d 376, 388 (S.D.N.Y. 2012)). The plaintiff "bear[s] the burden of showing that certification was improper." Lipkin v. SEC, 468 F. Supp. 2d 614, 623 (S.D.N.Y. 2006). The district court makes the factual determination whether the certification is proper, without necessarily accepting as true the allegations in the complaint. See Osborn, 549 U.S. at 231 ("The United States, we hold, must remain the federal defendant in the action unless and until the District Court determines that the employee, in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment.") (emphasis in original); Bowles v. United States, 685 F. App'x 21, 23 (2d Cir. 2017) (unpublished) ("the district court may strike such certification to the extent it finds that the defendant employee was not in fact acting within the scope of her employment") (emphasis added).

In reviewing a § 2679(d)(1) certification, a court applies state law principles concerning the scope of employment. Id. Because all the alleged events in this case took place in New York State, we look to New York State law. See, e.g., Jones v. United States, 408 F. Supp. 2d 107, 115 (E.D.N.Y. 2006); Kane v. United States, 189 F. Supp. 2d 40, 51 (S.D.N.Y. 2002).

   2. Scope of Employment Under New York Law

Under New York law, an employee's act is within the scope of employment if "the act was done while the servant was doing his master's work, no matter how irregularly, or with what

7

disregard of instructions." Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979) (quoting Jones v. Weigand, 134 A.D. 644, 645 (2d Dep't 1909)). So long as the employee was acting within the scope of employment, "[a]n intentional tort, such as the assault here, committed by an employee can result in liability for his or her employer." Ramos v. Jake Realty Co., 21 A.D.3d 744, 745 (1st Dep't 2005).

A five factor analysis guides New York courts in determining whether an employee's tortious act falls within the scope of his or her employment. Riviello, 47 N.Y.2d at 303; accord Marley v. Ibelli, 203 F. Supp. 2d 302, 309 (S.D.N.Y. 2001), aff'd, 53 F. App'x 564 (2d Cir. 2002); Maldonado v. Colon, 1998 WL 240479, at *3 (S.D.N.Y. May 12, 1998); Ramos, 21 A.D.3d at 745. Specifically, courts inquire into

> [1] the connection between the time, place and occasion for the act; [2] the history of the relationship between employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by such an employee; [4] the extent of departure from normal methods of performance; [5] and whether the specific act was one that the employer could reasonably have anticipated.

Riviello, 47 N.Y.2d at 303.[3] The Second Department has summarized the case law applying this test as follows:

> There is no single mechanical test to determine whether at a particular moment an employee is engaged in the employer's business, but decisional law has yielded various formulations, which are instructive. Did the employee's act . . . fall within the direction and control of the employer? Did the employee act under the express or implied authority of the employer? Was the employee's act in furtherance of the employer's interests? Were the employee's acts in the "discharge of duty" to the employer? Was it an act in the execution of the employer's orders or part of the work assigned by the employer? Were the acts "so closely connected" with what the employee was hired to do, and "so fairly

---

[3] Plaintiff in her initial letter to this Court contesting certification urged this court to apply the four prong test applied in Nathans v. Offerman, 922 F. Supp. 2d 271, 275-76 (D. Conn. 2013) to determine whether a defendant's conduct came within the scope of his or her employment. See Pl. Letter at 2. The Court in Nathans, however, applied Connecticut law. 922 F. Supp. 2d at 275.

8

and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment"?

Rausman v. Baugh, 248 A.D.2d 8, 10-11 (2d Dep't 1998) (citations omitted). The overall question being asked is whether the employee was "acting not on his or her own behalf, but in the employer's service." Id. at 10.

New York courts applying the test have not required a showing that the employer anticipated the specific tort alleged in the complaint "as long as the general type of conduct may have been reasonably expected." Riviello, 47 N.Y.2d at 303. For example, in Riviello itself, where a waiter/cook struck a patron in the eye with a penknife, the court emphasized that a bar owner might expect a waiter/cook to mingle with the patrons when business was slow and, in the course of performing the various activities of his job that required handling knives and other dangerous objects, harm a patron through an act of negligence. Id. at 304-05. It was not necessary, however, that the bar owner have anticipated the specific tort. Id. at 304. "[O]ne employing men and women," the Court explained, "takes them subject to the kind of conduct normal to such beings." Id. at 305; see also Ira S. Bushey & Sons, Inc. v. United States, 398 F.2d 167, 171-72 (2d Cir. 1968) (holding that a dock worker's drunken acts resulting in the sinking of a coast guard vessel and damage to a dry dock were "not so 'unforeseeable' as to make it unfair to charge the Government with responsibility," for "it was foreseeable that crew members crossing the drydock might do damage, negligently or even intentionally"); Marley v. Ibelli, 203 F. Supp. 2d 302, 309 (S.D.N.Y. 2001) (repeated "hostile and threatening" harassment of the plaintiff in the workplace arose in the scope of the employment of the alleged harasser because it occurred in the workplace and because it was inevitable that the workers would "come into physical contact with one another from time to time whether through clumsiness,

9

negligence, or intent") (citation omitted).

In Sims v. Bergamo, 3 N.Y.2d 531 (1957), a bartender refused to serve the plaintiff alcohol because he thought she was drunk and unruly, which prompted a loud "upbraiding" by the plaintiff. Id. at 534. After the plaintiff left the bar, the bar's window was broken and the bartender suspected plaintiff had broken it. Id. The bartender encountered the plaintiff outside and induced her to return to his bar and have a drink. Id. However, he then "grasped her by the shoulders, pushed her off the stool, forced her to the sidewalk, knocked her down, and proceeded to assault her with his feet." Id. The Court upheld a jury's determination that the assault was "committed within the scope of the bartender's employment and in furtherance of his employer's interests." Id. at 535. The Court noted: "[t]hat the assault was not the most prudent or expeditious manner of [protecting his employer's property and maintaining order in a bar] does not exclude it from the scope of the bartender's employment." Id. at 535.

Another case applying the doctrine in the assault context is De Wald v. Seidenberg, 297 N.Y. 335 (1948), in which a building superintendent pushed a tenant down a flight of stairs following a heated discussion with the tenant as part of the superintendent's effort to stop the tenant's maid from throwing water into a courtyard in violation of the building's rules. Id. at 337. The court found the lower court erred in ruling that the superintendent could not have been acting within the scope of his employment. Id. at 338. As the New York Court of Appeals put it, "[t]he master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another." Id. (citations

omitted).

In a similar assault case, Ramos, 21 A.D.3d at 744, a building superintendent attacked a tenant who had angered him by videotaping an inspection of the building's fire escape during a period in which the building's tenants were organizing a rent strike on account of poor maintenance of the building. Id. at 745. There, the court again found the lower court erred in ruling that the superintendent could not have been acting within the scope of his employment. Id. at 746. The court explained that "[w]hile there is no doubt that the superintendent's resort to physical violence was in poor judgment, this in itself does not absolve defendants of liability for his acts." Id. For, the court found, the superintendent's "animus, shared by management, was about the rent strike," and certainly, his conduct, preventing the collection of evidence regarding building conditions, helped further his employer's interests in quieting the rent strike. Id.

Here, the two sides agree that the first two factors listed in Riviello have been satisfied. Pl. Letter at 3; Def. Mem. at 7. The alleged assault occurred at an annually scheduled holiday party, during the work day, within the Unit where Smith and Brown worked. See Compl. ¶¶ 3, 7. It was also sanctioned by USCIS supervisors and playing games was a regular, supervisor-approved feature of the holiday parties. Savage Decl. ¶ 8-10.

Smith's dispute is with factors three, four and five which look to whether Brown's actions occurred as part of his work responsibilities and were foreseeable. See Pl. Response at 8, 9. Smith points out that the assault itself was not necessary to the necklace game nor within Brown's job requirements. See Pl. Letter at 2 (referring to an ISO's job description); Pl. Response at 8 ("There was no rational, work related reason for Mr. Brown (who is 15 years my junior, I was 55 at the time), to invade my personal space, lay his hands on me and physically remove the necklace"). But the same argument could have been made in De Wald and Ramos

given that the superintendents in those cases did not need to assault the tenants to enforce the apartment building rules or address a tenant strike. More pointedly, the question is not whether there was a "work related reason" for Brown's specific tortious act but whether his tortious act occurred within the scope of his work. See Riviello, 47 N.Y.2d at 304 ("Surely, the fact that [the defendant], at the precise instant of the occurrence, was not plying his skills as a cook, waiter or bartender did not take him beyond the range of things commonly done by such an employee."); Catania v. Herbst, 916 F. Supp. 2d 266, 271 (E.D.N.Y. 2013) (acts of defamation were within an employee's scope of employment, even though such acts were not among the employee's listed duties or the product of a specific request from a supervisor ). Here, the complaint itself alleges that Brown was the "Master of Ceremonies" for the party. Compl. ¶ 5. Indeed, Smith has conceded that the game was a work-related activity, see Robin Smith Questionnaire for Completion (attached as Ex. C to Tritz Decl.) ("Smith Questionnaire"), and thus Brown's participation in the game and the enforcement of the game's rules were part of his efforts to discharge the obligations of his employment.

Smith argues that Brown's manner of rule enforcement was not explained to the planning committee beforehand, and that they would have disapproved, had they known. Pl. Response at 12 n.1. Obviously, no employer would authorize an employee to physically assault another employee. But Brown's actions in allegedly doing so were no less foreseeable than a building superintendent pushing a tenant down a flight of stairs, De Wald, 297 N.Y. at 337, or a bartender throwing a patron to the sidewalk and kicking her, Sims, 3 N.Y.2d at 534. Smith concedes that Brown demanded she forfeit her beads "as a part of the game." Pl. Response at 2.[4]

---

[4] Some cases finding assaults by employees to be outside the scope of employment are distinguishable on their facts. See, e.g., Phillips v. Uber Techs., Inc., 2017 WL 2782036, at *6. (S.D.N.Y. June 14, 2017) (assault by a taxi driver on a passenger found to have occurred after

Under New York law, a defendant does not act within the scope of his employment "when he engages in tortious conduct for personal reasons separate and distinct from the interests of his employer." Bello v. United States, 93 F. App'x 288, 291 (2d Cir. 2004) (citing Ierardi v. Sisco, 119 F.3d 183, 188 (2d Cir. 1997) (correction officer not acting within the scope of employment when he sexually harassed coworker); Dykes v. McRoberts Protective Agency, 256 A.D.2d 2, 3 (1st Dep't 1998) (security guard was not acting within the scope of his employment when the assault resulted from a "personal grudge"). Smith argues that Brown's actions were the result of personal animus, asserting that the "Defendant clearly singled out plaintiff from other partygoers[,]" and that "Defendant's conduct . . . was [] a deliberate attack and assault on the plaintiff." Pl. Letter at 2, 3; accord Pl. Response at 10-11 ("There is, at the very least, a question regarding Mr. Brown's motivation"). But the complaint is devoid of the slightest suggestion that tortious conduct arose from any reason other than Brown's misguided effort to supervise the game. Indeed, the complaint is replete with detailed allegations of exactly what precipitated Brown's actions — all relating to Smith's perceived refusal to comply with the game's requirements. See Compl. ¶¶ 9-18. Moreover, in Smith's application for workers' compensation, she denied that there existed any "animosity between the assailant and I of a personal association away from work." Smith Questionnaire at 1. There is no suggestion that Brown gained anything personally from his tortious conduct. By contrast, cases where defendants have been found to have sought personal benefits have commonly involved sexual gratification, see, e.g., Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933 (1999) (sexual abuse); Ierardi, 119 F.3d at 188 (sexual harassment including sexually suggestive language and

---

the taxi ride had completed); Burlarley v. Wal-Mart Stores, Inc., 75 A.D.3d 955, 956. (3d Dep't 2010) (cashier's act of throwing heavy items at a customer as a 'joke' did not arise from "any work-related motivation")

assault), or a personal grudge, see, e.g., Dykes, 256 A.D.2d at 3. While Smith points out that Brown did not aggressively demand that any other participant in the game remove their beads, see Compl. ¶ 10, neither is there any allegation that others engaged in conduct similar to Smith.

Smith argues that she should be entitled to discovery on the issue of certification. Pl. Response at 10-12. In reviewing the Government's certification, a district court may order limited discovery. See, e.g., Stewart v. IRS, 157 F.R.D. 153, 156 (E.D.N.Y. 1994). However, where "the certification, the pleadings, the affidavits, and any supporting documentary evidence do not reveal an issue of material fact," the employee should not be "burdened with discovery." Griebsch v. Weaver, 2005 WL 2260374, at *2 (N.D.N.Y. Sept. 16, 2005) (citing Gutierrez de Martinez v. DEA, 111 F.3d 1148, 1153-55 (4th Cir. 1997)). Here, the Court has accepted the plaintiff's contentions regarding the material points in dispute and we do not view this as a case that merits burdening the defendant with discovery. For example, Smith requests discovery on the issue of Smith's motives. Pl. Response at 12. But Smith herself has already admitted that there was "no animosity" between her and Brown "of a personal association away from work." See Smith Questionnaire at 1. She also seeks discovery regarding Brown's explanation to the planning committee of the game, contending that Brown did not explain to the committee that he would assault participants who refused to give up the beads, and that if he had done so, they would not have authorized the action. Pl. Response at 12 n.1. But even if Brown had not revealed this to the committee, it would not alter the Court's conclusion that Brown's actions were within the scope of his employment.

Accordingly, the Court upholds the Government's certification and the United States is hereby substituted as the party defendant in this case.

B. Subject Matter Jurisdiction

The Government argues that once the United States is substituted as a defendant, the case must be dismissed for lack of subject matter jurisdiction. See Def. Mem. at 12.

1. Governing Law

A case must be dismissed for lack of subject matter jurisdiction under Federal Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Under the Constitution, the United States Government possesses absolute immunity from suit in its courts without its consent "and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941); see also United States v. Navajo Nation, 537 U.S. 488, 502 (2003) (same). "[C]ompliance with the conditions under which the government has agreed to waive sovereign immunity is necessary for subject matter jurisdiction to exist." Williams v. United States, 947 F.2d 37, 39 (2d Cir. 1991). The plaintiff ultimately carries "the burden of proving by a preponderance of the evidence that [jurisdiction] exists." Makarova, 201 F.3d at 113.

When deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). Where jurisdictional facts are disputed, however, "the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (quoting LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999)).

2. Discussion

5 U.S.C. § 8116(c) provides that "[t]he liability of the United States or an instrumentality thereof under [FECA] with respect to the injury or death of an employee is exclusive and instead of all other liability of the United States." Thus, when a federal employee is injured on the job, FECA provides the exclusive remedy. See Mathirampuzha v. Potter, 548 F.3d 70, 80 (2d Cir. 2008) ("When the tort victim is also a federal employee, however, work-related injuries are compensable only under the FECA."); accord Votteler v. United States, 904 F.2d 128, 130 (2d Cir. 1990) ("FECA is the exclusive remedy for work-related injuries sustained by federal employees."). "FECA's exclusive liability provision . . . was designed to protect the Government from suits under statutes, such as the Federal Tort Claims Act, that had been enacted to waive the Government's sovereign immunity." Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 193-94 (1983). Accordingly, employees eligible for FECA "are guaranteed the right to receive immediate, fixed benefits, regardless of fault and without need for litigation, but in return they lose the right to sue the Government." Id. at 194. Generally, employees are FECA-covered so long as the injury occurs in the performance of their duties, a determination made by the Secretary of Labor. See 5 U.S.C. §§ 8102, 8145; Mathirampuzha, 548 F.3d at 81. Unlike the FTCA scope of employment certification, the decision on FECA coverage is "not subject to review . . . by a court." 5 U.S.C. § 8128(b).

The Secretary of Labor's authority to decide questions under FECA has been delegated to the OWCP. See 20 C.F.R. § 1.2(a). Here, the OWCP has accepted Smith's claims for FECA coverage. See Tritz Decl. ¶¶ 6, 7, 10; Acceptance Letter. Because Smith's claim is covered by FECA, and because FECA "deprives federal courts of subject-matter jurisdiction to adjudicate claims brought under the FTCA for workplace injuries that are covered by the FECA,"

16

Mathirampuzha, 548 F.3d at 81 (citing Granade v. United States, 356 F.2d 837, 840 (2d Cir. 1966)), this Court does not have subject matter jurisdiction over Smith's claim under the FTCA and it must be dismissed

    C. *Bivens* Claim

Smith argues that she should be entitled to pursue a claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against Brown in his individual capacity for violations of her Fourth, Fifth and Eighth Amendment rights. Pl. Response at 12-16. Assuming arguendo that the applicability of FECA does not bar a Bivens claim, no Bivens claim is stated here.

The Fourth Amendment, which guarantees an individual the "right to be secure in their persons . . . against unreasonable searches and seizures," protects individuals from the unreasonable use of force when a law enforcement official makes "an arrest, investigatory stop, or other 'seizure' of his person." Graham v. Conner, 490 U.S. 386, 395 (1989). "[T]he principal concern of [the Fourth] Amendment's prohibition against unreasonable searches and seizures is with intrusions on privacy in the course of criminal investigations." Ingraham v. Wright, 430 U.S. 651, 673 n.42 (1977). Here, there is not the slightest suggestion in the complaint that Brown was acting as a law enforcement officer who was effectuating an arrest, stop, or search or seizure when he had physical contact with Smith.

While Smith does not specify what clause of the Fifth Amendment she contends has been violated, the only possibly applicable clause — the due process clause — cannot be implicated because Smith was not put through any "process" during the course of the holiday party. Finally, there is no viable claim under the Eighth Amendment's prohibition of cruel and unusual punishment because "the Eighth Amendment applies only to convicted prisoners." Simpson v.

Town of Warwick Police Dept., 159 F. Supp. 3d 419, 443 (S.D.N.Y. 2016); see also City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (quoting Ingraham, 430 U.S. at 671 n.40).

III. CONCLUSION

In sum, Brown's motion to substitute the United States as named defendant (Docket # 11) is granted and its motion to dismiss all claims against the United States is also granted. Any claim against defendant Brown under Bivens is dismissed.

The Clerk is requested to enter judgment dismissing the complaint.

SO ORDERED.

Dated: October 27, 2017
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy mailed to:

Robin Smith
1059 E. 98th St.
Brooklyn, NY 11236